UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARTY SCHWENINGER, )<br>      Plaintiff, )<br>v. )<br>)<br>ADVANCED VISION TECHNOLOGY, INC. )<br>A/K/A AVT, INC. )<br>Defendant. )<br>) | Case No.: 1:15-cv-07009<br>Honorable Joan H. Lefkow |

**DEFENDANT'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Employers can lawfully pay employees who work fluctuating hours a fixed salary that includes overtime premiums under an arrangement called a "Belo Plan." Under the Fair Labor Standards Act ("FLSA"), the requirements of a valid Belo Plan are: (1) the payments must be made pursuant to a *bona fide* individual agreement; (2) the duties of the employee necessitate irregular hours of work; (3) the agreement specifies a regular rate of pay; and (4) the agreement provides a weekly pay guarantee. Plaintiff claims that defendant Advanced Vision Technology, Inc. ("AVT") violated the FLSA by failing to comply with these requirements. The undisputed facts demonstrate, however, that AVT has met all statutory requirements and that its Belo plan is valid as a matter of law. The Court should enter summary judgment in AVT's favor.

**FACTS**

**I.    The Parties and the Belo Contract**

AVT is in the business of designing, manufacturing, selling, installing and maintaining printing technology for the printing industry. *See* Statement of Material Fact ("SMF") at ¶ 3. There are more than 7,000 AVT systems installed at customer sites worldwide. *See id.* Plaintiff

Martin Schweninger ("Schweninger") was employed by AVT as a Field Service Engineer ("FSE") from before December 2009 until he resigned in September 2014. *See* SMF at ¶ 4.

In December 2009, AVT presented Schweninger with a letter notifying him that AVT planned to implement a Belo Plan, effective January 1, 2010 (the "Belo Contract"). *See* SMF at ¶ 5. The Belo Contract specified that its purposes were to allow AVT to better control its costs, while, at the same time provide "predictable, steady income to [AVT's] FSEs." *See id.* The Belo Contract also specified that Schweninger would be paid a fixed weekly salary calculated at 40 hours times Schweninger's regular rate, plus 10 hours at one and one half times the regular rate. *See* SMF at ¶ 7. For each hour over 50 in a work week, Schweninger would be paid, in addition to his weekly salary, one and one half times his regular rate. *See id.*

The Belo Contract provided that Schweninger's regular pay rate would be $22.73, his overtime rate would be $34.10, and his weekly pay guarantee would be $1,250.20 per week – the equivalent of payment for 40 hours at $22.73 plus 10 hours at $34.10. *See* SMF ¶ 8. Schweninger would be paid an overtime hourly rate of $34.10 for any time worked over 50 hours in a week. *See id.*

The Belo Contract made clear that agreement to its terms was a condition of continued employment after its effective date (January 2010), and provided that Schweninger was to sign and return the Belo Contract to confirm his agreement to its terms. *See* SMF at ¶ 10. Schweninger signed and returned the Belo Contract and continued to work at AVT after January 2010. *See* SMF at ¶ 11. Beginning in January 2010, and continuing throughout his remaining employment with AVT, Schweninger was properly compensated under the provisions of the Belo Contract. Schweninger Depo. *See* SMF at ¶ 12. In September 2014, Schweninger voluntarily resigned from AVT. *See* SMF at ¶ 13.

## II. Schweninger's job duties

Schweninger's job duties as an FSE included the installation and repair of AVT systems, maintenance, troubleshooting customer problems, remote support, system upgrades, ordering parts, promoting sales, customer consultation, paperwork, pre-installation schematics and drawings, training customer employees, attending training, and extensive travel both by car and by plane to customer locations. *See* SMF at ¶ 14.

Schweninger performed these duties with respect to various AVT products including: Jupiter, Genesis, Apollo, Helios and Argus. In addition, in performing his duties, Schweninger worked on a variety of printing presses and installed AVT equipment onto a vast array of different types of customer presses. *See* SMF at ¶ 15.

Schweninger's duties also required him to be "on-call" and responsible for addressing customer emergencies, which sometimes could be handled on the phone, but sometimes required in-person visits. *See* SMF ¶ 16.

Although Schweninger's FSE assignments were scheduled in advance, the number of hours required to complete each assignment was not controlled or anticipated with a reasonable degree of certainty by AVT. *See* SMF at ¶ 17. As follows, each component of his duties was subject to variables beyond his or AVT's control.

### A. Travel

Schweninger was required to travel extensively (virtually every week) back and forth to customer sites – and the travel time for each trip varied. *See* SMF at ¶ 18. While AVT determined the locations where Schweninger was to travel, the length of time it took to travel to each location depended on the customer's location. *See* SMF at ¶ 19. As Schweninger testified

in his deposition, a trip could take "two, three, four hours to all day." SMF at ¶ 20. At times Schweninger's work required that he change his flight to return earlier or later. *See* SMF at ¶ 21.

      B.      **Installation and Training**

Installation of machinery would take different amounts of time in different instances depending on what type of product the customer wanted installed, what kind of press the customer used, and how many pieces of equipment the customer had purchased. *See* SMF at ¶ 22. Schweninger admitted in his deposition that installation "could take anywhere from a couple days, some only one day, depending on what it was, and then … start the training process." SMF ¶ 23. Installation time was also impacted by shipment of incorrect parts and waiting for parts deliveries. *See* SMF at ¶ 24.

Training, which often took place in conjunction with installation, took varying amounts of time depending on the type of product, the number of shifts at the customer's location, and the number and type of customer employees being trained. *See* SMF at ¶ 25. For example, training time "varied by if [Schweninger] had five people to train or if [he] had ten people to train it would be a little bit longer or shorter" and training of maintenance employees took less time than training other types of employees. SMF at ¶ 26.

      C.      **Repairs/Maintenance**

Repairs/maintenance calls took varying amounts of time depending on the nature of the customer's problem. *See* SMF at ¶ 27. System upgrades took different amounts of time depending on the product involved. *See* SMF at ¶ 28.

Schweninger recalled that depending on the specific item that needed to be repaired/replaced, the work could take one to two days or an hour. *See* SMF at ¶ 29. One variable impacting the ability to predict how long a repair would take was whether AVT's

technicians had been able to troubleshoot the issue over the phone. SMF at ¶30. Schweninger testified that if "no one had dialed in from the office, so to speak, you wouldn't know whether it was a ten-minute or a five-hour, but you would be pretty certain you could get your head around it within the first day easy." *See id*.

In addition, some repairs could double in time, depending on what was found during the repairs. Schweninger testified:

> A. It would just be a matter of checking, and if it looks like it's good, then you're done. You take the alignment jigs off and you move to the next part, so if it's still within specs, it's a lot quicker than having to realign it.
>
> Q. But there is a fluctuation in time; correct?
>
> A. Yes, but you're talking about – if everything is good, you're talking two hours. If everything needs to be moved, it's four hours.
>
> Q. So basically double the time could be order of magnitude of two times, an estimate; correct? One hour – you said two hours it could be four hours; correct?
>
> A. Yes.

*See* SMF at ¶ 31. Schweninger was then asked if he could give other examples of recurring repairs. His response underscored the unpredictability of repair work: "Not really. There's not a large number of things. I mean, they were usually just kind of one off little issues." *Id*. at ¶ 32.

### D. Remote Support/On-Call Time

Remote support (or "on-call" time) took varying amounts of time depending on the customer's problem. Schweninger's on-call duties were to be available to handle service calls/questions as they came in from customers. *See* SMF at ¶ 33. While Schweninger was scheduled to be "on-call" for a certain day or days, there was no way AVT or Schweninger could know in advance the number of calls he would handle in any given day. *See* SMF at ¶ 34.

For example, when he was on call, Schweninger would support AVT's Texas and Atlanta offices. *See* SMF at ¶ 35. While AVT would decide which weeks Schweninger would be on call, whether Schweninger received any calls during that time would depend not just on whether a customer called in, but also on whether, at the time of the call, there was someone available in the Texas or Atlanta office who could handle the call. *See* SMF at ¶ 38.

Similarly, there was no "range of time" that each call would take. *See* SMF at ¶ 36. As Schweninger testified: "[E]ach troubleshooting call was its own entity …. [I]t could take a few minutes or an hour." *Id*. Schweninger testified that he could not list the top subject matters of the customer calls because "it was too random." SMF at ¶ 37. Under the Belo Contract Schweninger was paid for the entire day, regardless of the number of calls, or the time spent on the phone. *See* SMF at ¶ 39.

Other unpredictable variables impacted Schweninger's hours, such as delays related to acquiring parts needed for a job, and delays related difficult customers. *See* SMF at ¶ 40.

In short, although AVT may have had a general idea about how long an assignment might take, or how many days an assignment might take, the nature of Schweninger's duties were such that neither Schweninger nor AVT could either control or anticipate with any degree of certainty the specific number of hours he would have to work from week to week. *See* SMF at ¶ 41.

### III. Schweninger's hours during the relevant time period

Schweninger's hours during the relevant time period (August 2012 – September 2014) reflected the unpredictable nature of his job duties. His hours fluctuated both below and above 40 hours per week. Schweninger worked fewer than 40 hours in 25 out of 99 weeks between the weeks of August 12, 2012 and September 7, 2014. *See* SMF at ¶ 42. In addition, Schweninger's hours during weeks in which he worked less than 40 hours varied greatly. During those 25

weeks, Schweninger worked fewer than 10 hours three times, between 10 and 20 hours three times, between 20 and 30 hours seven times, and between 30 and 40 hours twelve times. *See* SMF at ¶ 43. Schweninger worked exactly 40 hours (or was recorded as having worked 40 hours due to vacation/sick time) in nine weeks. *See* SMF at ¶ 45.

### IV. Schweninger's claims in this action

Schweninger initiated this action on August 11, 2015 alleging three claims against AVT arising out of the Belo Contract: (1) violation of the FLSA; (2) willful violation of the FLSA; and (3) liquidated damages in the amount of alleged unpaid compensation. *See* Complaint, *Exhibit 1*, at Counts I – III.

The FLSA includes a limitations period of two years for a violation of the FLSA, and of three years for a willful violation of the FLSA. *See* 29 U.S.C. § 255. Accordingly, the relevant time period for Schweninger's claims is no earlier than the week of August 12, 2012. As explained below, because Schweninger has provided absolutely no evidence that any alleged violation of the FLSA was willful, Schweninger's claims should be limited to the time period of August 12, 2013 to September 7, 2014. As follows, however, regardless of the time period, as a matter of law, the Belo Contract at issue was valid and enforceable, and all of Schweninger's claims must be dismissed.

## ARGUMENT

### I. Summary judgment standard

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of

7

law." Fed. R. Civ. P. 56(c). A disputed fact is material if it might affect the outcome of the suit in light of the substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

To avoid summary judgment, Schweninger must show that a disputed issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Schweninger must provide admissible evidence of specific facts, and cannot rely on conclusory statements or speculation. Local Rule 56.1; *Weihaupt v. American Med. Ass'n*, 874 Fed.2d 419, 428 (7th Cir. 1989). Schweninger must "go beyond the pleadings" and set forth specific facts to sow that a genuine dispute of material fact exists. *Hong Kong v. Children's Mem. Hosp.*, 993 F.2d 1257, 1261 (7th Cir. 1993), *cert. denied*, 511 U.S. 1005 (1994).

## II.  **The Belo Contract is valid as a matter of fact and law**

A Belo plan is a valid and enforceable exception to the FLSA overtime requirement if it meets the following statutory requirements: (1) the payments to the employee must be made pursuant to a *bona fide* individual agreement; (2) the duties of the employee necessitate irregular hours of work; (3) the agreement specifies a regular rate of pay; and (4) the agreement provides a weekly pay guarantee. *See* 29 U.S.C. § 207(f); 29 C.F.R. §§ 778.403-778.408; *Donovan v. Brown Equipment and Service Tools, Inc.*, 666 F.2d 148, 152-153 (5th Cir. 1982).

In codifying the Belo exception to the FLSA overtime requirements, Congress recognized that Belo plans benefit both employers and employees. Specifically, Section 778.404 ("Purposes of Exemption") provides that the Belo exception is:

> designed to provide a means whereby the employer of an employee whose duties necessitate irregular hours of work and whose total wages if computed solely on an hourly rate basis would of necessity vary widely from week to week, may guarantee the payment, week-in and week-out, of at least a fixed amount based on his regular hourly rate …. **Such a contract affords to the employee the security of a regular weekly income and benefits the employer by enabling him to anticipate and control in advance at least some part of his labor costs. A guaranteed**

8

> **wage plan also provides a means of limiting overtime computation costs so that wide leeway is provided for working employees overtime without increasing the cost to the employer**, which he would otherwise incur under the Act for working employees in excess of the statutory maximum hours standard.

(emphasis added). In short, a Belo plan provides an employee whose hours fluctuate below and above 40 hours a guaranteed pay amount (and thus avoid the problem of smaller paychecks in sort weeks) while at the same time providing the employer with cost predictability.

Here, the undisputed facts show that AVT's Belo Contract with Schweninger was a *bona fide* individual agreement, Schweninger's duties necessitated irregular hours of work that could not be controlled or reasonably anticipated by AVT, and the Belo Contract provided a regular rate of pay and a weekly pay guarantee.

    A.    **The Belo Contract was a *bona fide* individual agreement**

The Department of Labor characterizes a *bona fide* individual agreement as existing where the employee is aware of and has agreed to the method of compensation in advance of performing the work. 29 C.F.R. § 778.407. A Belo agreement is *bona fide* and made in good faith where it is prospectively implemented with an employee's knowledge and consent, and is not an after-the-fact justification of the employer's method payment. *See id.*; *Anderson v. North Roanoke Vet. Clinic, Inc.*, 1997 U.S. Dist. LEXIS 1336, *8, 11 (W.D. Va. Jan. 17, 1997)[1]; *Boll v. Federal Reserve Bank of St. Louis*, 365 F.Supp. 637, 644 (E.D. Mo. 1973).

For example, in *Anderson*, the Court held that a Belo agreement was not *bona fide* because the employee had not signed a Belo agreement or agreed to one orally, and there was confusion as to the employee's pay and hours. Conversely, in *Boll*, the Court found that the Belo agreement **was** *bona fide* where there was no evidence of bad faith and the provisions of the Belo agreement were explained to plaintiff before plaintiff performed any work for employer.

---

[1] Because a Westlaw cite is not available for this case, a copy is attached hereto as Exhibit 10.

The fact that the Belo Contract in this case was a condition of employment does not detract from the good faith nature of the Contract. In fact, there is no statute, regulation, or case prohibiting employers from proposing Belo agreements as a condition of employment.

Similarly, there is no requirement that employers provide employees with a choice between the Belo arrangement and being paid conventional overtime. In fact, it is well-settled in this Circuit and elsewhere that contracts offered as a condition of continued employment are enforceable. *See, e.g.*, *Pohlman v. NCR Corp.*, 2013 WL 3776965, at *2-5 (N.D. Ill. 2013) (holding that the parties entered into a valid agreement when the employer mailed the employee a letter outlining that by continuing to work for the employer the employee accepted the arbitration policy outlined in the letter); *Tinder v. Pinkerton Security*, 305 F.3d 728, 734-35 (7th Cir. 2002) (Wisconsin law) (employer's "unilateral decision to implement the program does not demonstrate that [the employee] did not agree to be bound"); *Melena v. Anheuser-Busch, Inc.*, 219 Ill. 2d 135, 151-52 (2006) (Court rejected argument that because agreement was offered on a "take it or leave it" basis it was enforceable; employee had accepted an arbitration agreement by continuing her employment with the employer).

Schweninger was aware of and agreed to the method of compensation in advance of performing work for AVT. SMF at ¶¶ 5, 10, and 11. The Belo Contract plainly set forth the method of compensation and the details of AVT's Belo plan. *See* SMF at ¶ 10. It established a regular rate of pay, and an overtime rate of pay, and guaranteed that Schweninger would be paid a fixed weekly salary of at least $1,250.20, calculated at 40 hours times Schweninger's regular rate of $22.73, plus 10 hours at his overtime rate of $34.10. *See* SMF at ¶ 8. It further provided that for each hour over 50 in a work week, Schweninger would be paid, in addition to his weekly salary, one and one half times his regular rate. *See* SMF at ¶ 7.

The Belo Contract made clear that it was a condition of continued employment and, in accordance with the Belo Contract's terms, Schweninger signed and returned the Contract and continued working for AVT after the effective date of the Contract. *See* SMF at ¶¶ 10-11; *see Melena*, 219 Ill. 2d at 151-51 ("By continuing her employment with Anheuser-Busch, plaintiff both accepted the offer and provided the necessary consideration.").

The Belo Contract was a *bona fide* agreement made in good faith.

### B. Schweninger's duties necessitated irregular hours of work

The second requirement of 29 U.S.C. § 207(f) has two components: (1) the employee's hours must fluctuate above and below 40 hours per week, and (2) this fluctuation must be caused by the nature of the job, and the amount of hours must not be controlled or reasonably anticipated by the employer or employee. The Belo Contract meets these components.

#### 1. Schweninger's hours fluctuated over and under 40 hours

"For hours to be considered irregular within the meaning of section 7(f), they must, in a significant number of weeks, fluctuate both below forty hours per week, as well as above, and the fluctuations below forty must result from work requirements, not vacations, holidays, illness or reasons personal to the employee." *Donovan v. Brown Equipment and Service Tools, Inc.*, 666 F.2d 148, 154 (5th Cir. 1982). Similarly, there must be a variation in the number of hours worked. Thus, where an employee did not work "much less than" forty hours in the weeks in which she worked less than forty hours, there was not a "significant variation" in the weekly hours of work. *See Anderson*, 1997 U.S. Dist. LEXIS at *15.

Under the statute, the term "significant number of weeks" does not mean a majority, or even a quarter, of the total number of workweeks. In fact, in *Walling v. Halliburton Oil Well Cementing Co.*, the United States Supreme Court upheld Belo contracts under which oil well

servicing employees worked fewer than forty hours per week in only 13% of workweeks, and worked over forty hours in 87% of the workweeks. *See Walling v. Halliburton Oil Well Cementing Co.*, 331 U.S. 17, 21 n. 8 (1947).

Schweninger's hours fluctuated both below and above 40 hours per week, and there was great variation in all weeks, including weeks in which Schweninger worked fewer than 40 hours.

As set forth above, during the relevant time period, Schweninger worked fewer than 40 hours in 25 out of 99 weeks, slightly more than 25% of the time. *See* SMF at ¶ 42.

In addition, Schweninger's hours during all 99 weeks varied significantly. For example, during the three month period from the beginning of May to the end of July 2014, Schweninger worked the following hours each week: 47, 27.2, 53.5, 47.5, 9.2, 52, 44, 50.5, 8.5, 28.5, 41, 39.5, and 40 (vacation time). *See* SMF at ¶ 44. Similarly, during the 25 weeks in which Schweninger worked fewer than 40 hours, Schweninger worked fewer than 10 hours three times, between 10 and 20 hours three times, between 20 and 30 hours seven times, and between 30 and 40 hours twelve times. *See* SMF at ¶¶ 42, 43, and 44.

Schweninger worked exactly 40 hours (or was recorded as having worked 40 hours due to vacation/sick time) in nine weeks. *See* SMF at ¶ 45 Accordingly, Schweninger was at or below 40 hours in 34 out of 99 weeks, and was above 40 hours in 65 weeks. *See* SMF at ¶¶ 42, 43, 44, and 45; *compare Halliburton*, 331 U.S. at 21 n. 8 (1947) (employees worked fewer than 40 hours 13% of the time and worked more than 40 hours 87% of the time).

### 2. **Schweninger's hours could not be anticipated.**

Under a proper Belo plan, the employer should not be able to manipulate the irregularity of hours. *See Donovan v. Welex, a Div. of the Halliburton Corp.*, 550 F.Supp. 855, 858 (S.D. Tx. 1982). Thus, where an employer scheduled regular days off on a repeating schedule (and the

schedule was not dictated by availability of work) the employee's hours were not sufficiently irregular under the Belo analysis. *Id.*

Here, the fluctuations in Schweninger's hours were driven by customer need and were due to the inherent nature of Schweninger's duties. They were not controlled by AVT, and could not be anticipated with any degree of certainty by AVT or Schweninger.

More specifically, as noted above, Schweninger's hours were driven by variables in customer needs, travel times, product-types and problems. *See* SMF at ¶¶ 17,-31, 34, 36, 38, 40. While AVT scheduled Schweninger's work assignments, AVT had no control over how long it would take Schweninger to get to a job site, what problems (i.e., late equipment, incorrect equipment delivery) he might encounter when he arrived at the job, how long a specific installation would take, or how many/what types of employees the customer needed to have Schweninger train. *See* SMF at ¶ 41. Similarly, while AVT scheduled Schweninger to be "on-call," AVT obviously had no say in whether Schweninger fielded one call or fifty calls in a day, or what type of follow-up woke would be required as a result of each call. *See* SMF at ¶ 34.

This case is similar factually to *Boll v. Federal Reserve Bank of St. Louis*, 365 F. Supp. 637 (E.D. Mo. 1973). In *Boll* the employee was an assistant bank examiner whose job entailed extensive travel to various banks. The defendant employer "established the schedule of banks to be examined at the beginning of each year and determined several months in advance of examination which individuals were to examine particular banks[.]" *Id*. at 645. The Court rejected the employee's argument that the employer had discretion over the employee's schedule, stating:

> [W]hile the examination of banks was scheduled ahead of time, the number of hours that would be required to complete an examination was not known by defendant. Although defendant would obviously know that the examination of a large bank would probably require more time than

> the examination of a smaller bank, the number of hours the assistant examiners would work during a particular examination could not be controlled by defendant nor could the number of hours they would work be anticipated with any degree of certainty. Thus, the number of hours plaintiff worked per week were not the result of the discretion of defendant nor were they ascertainable from the schedule of the order in which banks would be examined. Plaintiff's duties necessitated irregular hours of work.

*Id*. This is not a situation where an employer is manipulating the employee's hours (*see, e.g.*, *Welex*, 550 F.Supp. at 858). Instead, here, the hours were dictated by customer needs, travel, and product type – which, similar to the employee's duties in *Boll* – were beyond the control of AVT or its employees.

      C.    **The Belo Contract specified a regular rate of pay and a weekly pay guarantee.**

The Belo Contract satisfied the third and fourth requirements of 29 U.S.C. § 207(f) because it specified a regular rate of pay ($22.73 regular pay and $34.10 overtime) and a weekly pay guarantee ($1,250.21). There is no dispute that Schweninger was paid at these rates, and no dispute that he was paid properly for all overtime hours worked. *See* SMF at ¶ 12.

As a matter of fact and law, the Belo Contract was valid and enforceable. Accordingly, the Court must enter summary judgment in favor of AVT on Counts I – III of the Complaint.

**III.**    **There is no evidence of any willful violation of the FLSA**

Even if the Belo Contract was unenforceable, Schweninger's claim would be limited to the time period from August 2013 to September 2014 because Schweninger has presented no evidence to support his claim that AVT's alleged violation of the FLSA was "willful." *See McDonald v. Vill. of Palatine*, 2012 WL 2590492 at *3 (N.D. Ill. June 29, 2012) (plaintiff bears burden of showing willful violation). Schweninger must show that AVT "either knew [it] was violating the Act or was indifferent to whether [it] was violating it or not (and therefore

'reckless').'" *E.E.O.C. v. Madison Cmty. Unit. Sen. Dist.*, 818 F.2d 577, 585 (7th Cir. 1986). To survive summary judgment Schweninger must present admissible evidence of willfulness. *See Weihaupt*, 874 Fed.2d at 428; *Hong Kong*, 993 F.2d at, 1261.

Here, there is no evidence of any violation of the FLSA, much less a willful violation. In fact, in response to an Interrogatory to "Describe in complete detail how AVT's alleged violation of the [FLSA] was 'wilfull.'" Schweninger responded:

> The only understanding I personally have of how AVT's violations of the FLSA were legally willful is information that has been provided to me by my attorney and is protected by the attorney/client privilege.

*See* SMF at ¶ 46. In other words, there are no facts supporting Schweninger's bald claim. Count II is merely an unsupported effort to claim an additional year of damages.

## CONCLUSION

The undisputed facts and law demonstrate that the Belo Contract was valid The Court should grant AVT's summary judgment motion as to all counts of the Complaint. AVT requests a hearing on its motion for summary judgment.

ADVANCED VISION TECHNOLOGY

By: /s/ Doreen M. Zankowski
One of its attorneys
Doreen M. Zankowski (admitted *pro hac vice*)
Duane Morris LLP
100 High Street, Suite 2400
Boston, MA 02110
P: 857-488-2400
F: 857-488-4201
dmzankowski@duanemorris.com

Dated: June 17, 2016

CERTIFICATE OF SERVICE

    I certify that on June 17, 2016, I served the foregoing Memorandum in Support of Motion for Summary Judgment on Plaintiff's counsel via ecf.

/s/ Doreen M. Zankowski